**Opinion filed October 18, 2012**



# In The

# Eleventh Court of Appeals

_____

## No. 11-11-00033-CV

_____

## SCS BUILDERS, INC. AND SONNY CALVIN SPOON, Appellants

## V.

## SHERRI SEARCY, Appellee

**On Appeal from the 70th District Court**
**Ector County, Texas**
**Trial Court Cause No. A-125,846**

### O P I N I O N

Sherri Searcy sued SCS Builders, Inc. and Sonny Calvin Spoon in connection with the construction of a home that they agreed to build for her. SCS and Spoon filed a counterclaim against Searcy for defamation related to certain internet and other comments allegedly made about them, and they sought damages of $1,000,000. The trial court granted judgment for "actual and/or economic damages" as well as additional damages to Searcy on various violations of the Deceptive Trade Practices-Consumer Protection Act.[1] In the alternative, the trial court awarded Searcy damages in connection with the judgment on her common-law fraud claims.

---

[1] All references to the DTPA are to TEX. BUS. & COM. CODE ANN. ch. 17, subch. E (West 2011 & Supp. 2012).

The trial court awarded trial court attorney's fees to Searcy in the amount of $20,000 and additional attorney's fees in the event of an appeal to the court of appeals and to the Texas Supreme Court. The trial court entered a take-nothing judgment on SCS and Spoon's defamation counterclaim. We affirm.

This case finds its genesis at a time when Searcy decided to have a home built for her son and his family. She wanted to locate it at the rear of property already owned by her and upon which her own home sat. In the course of selecting a builder to construct the new home, Searcy saw SCS's sign at a property upon which SCS was working. Searcy contacted Spoon, SCS's owner, about her own project. Spoon showed Searcy, her son, and her daughter-in-law some of the work that he and SCS had performed. Searcy also saw some of SCS and Spoon's advertising. Spoon told Searcy that she was in good hands with SCS and Spoon and that she could trust them.

Searcy and Spoon discussed the fact that it was important that they finish the home by December 2007 so that Searcy's son and his family could move into it then. Searcy's son, daughter-in-law, and their two-year-old daughter lived in a one-bedroom apartment, and the lease on that apartment was set to expire around that time. Additionally, Searcy's son and his wife were expecting a new baby in December. The evidence shows that Spoon understood the importance of the completion date and that he represented many times that they would finish the home by then.

Ultimately, Searcy entered into an agreement with SCS and Spoon whereby they agreed to build the home for her for $68,300. The parties signed an agreement on September 25, 2007. By October 25, 2007, within a month after the contract was signed, Searcy had paid SCS and Spoon $61,470; the total balance remaining on that date was $6,830.

The desired December completion date was not made a part of the agreement that the parties signed. According to Spoon, SCS and Spoon "badly missed that deadline." Searcy fired SCS and Spoon in January 2008. For five consecutive weeks during the period between the date that the parties signed the agreement and the date Searcy fired SCS and Spoon, no one showed up to work on the project. Spoon acknowledged that they messed up on Searcy's work, but he said that it "wasn't from a premeditated stance." Spoon testified that, at the time they were doing Searcy's project, "we had about 30 jobs in progress and we had already completed about a hundred." He was also remodeling his own house.

2

The record shows that, when SCS and Spoon did not finish the home by the time Spoon said they would, Searcy and her husband—a victim of a type of Parkinson's disease—and their daughter had to make room in their own home for Searcy's son, his wife, their two-year-old daughter, as well as their newborn baby. Searcy's son and his family lived in Searcy's den for approximately twenty months while the new home was being completed by the Searcys and other contractors that they had hired. Searcy testified that SCS and Spoon's failure to have the home ready caused her anguish. Searcy suffered many sleepless nights and shed many tears. The living situation was a strain on everyone and resulted in family fights. She testified that, as far as physical symptoms were concerned, "I don't know how to go about putting it in words." The trial court found that Searcy suffered great hardship when the home was not completed on time. In his testimony, Spoon agreed that Searcy suffered "extreme hardship."

As far as the quality of the work performed by SCS and Spoon, it is undisputed that SCS and Spoon's work was substandard. The trial court found many areas in which SCS and Spoon's work was faulty. SCS and Spoon built the house so that it was "improperly oriented": the front faced north rather than west as it should have faced. The front door was located where the back door should have been. There were problems with the foundation, the doors, the windows, the plumbing, and many other things. Searcy spent approximately $76,016—in addition to the $61,470 she had already paid to SCS and Spoon—to "remediate" the work that SCS and Spoon did not perform correctly. That amount included various inspection and attorney's fees—the amounts of which are not reflected in the record. The trial court found that, although SCS and Spoon had "completed some work, it was 'not good work'" and that Searcy had gotten "little or no value for the money she paid" to SCS and Spoon.

Searcy sued SCS and Spoon for alleged violations of the DTPA in that they used or employed false, misleading, or deceptive acts or practices listed in Section 17.46(b) of the DTPA when they: (1) represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they did not have or that SCS and Spoon had sponsorship, approval, status, affiliation, or connections that they did not have and (2) represented that goods or services were of a particular standard, quality, or grade when they were of another. Searcy also pleaded that SCS and Spoon breached the implied warranty of fitness for a particular purpose and the implied warranty of good and workmanlike performance and sought recovery under Section 17.50(a)(2) of the DTPA. Searcy alleged that she relied upon

each of those false, misleading, or deceptive acts or practices. Searcy further alleged that SCS and Spoon engaged in an unconscionable action or course of action when they took advantage of her lack of knowledge, ability, experience, or capacity to an unfair degree in violation of Section 17.50(a)(3) of the DTPA. In addition to her DTPA claims, Searcy also pleaded causes of action for common-law fraud, negligent performance of the duty to construct the house in accordance with specifications, and breach of contract.

After Searcy filed this lawsuit, the parties entered into a settlement agreement. Spoon testified that he paid Searcy $12,000 toward that settlement, but later refused to pay any more. Spoon admitted that Searcy had a legitimate complaint about the work they did, that she had every right to be unhappy with the work, and that he did not blame Searcy for firing SCS and him. Spoon testified that his work was "piss poor work." From its findings of fact and conclusions of law, it is apparent that the trial court was of the opinion that the evidence supported Spoon's assessment of the quality of the work. However, the trial court did not found its judgment on a breach-of-contract theory. Rather, the trial court based its judgment upon the violation of duties outside the contract that are imposed statutorily under the DTPA and upon remedies that are provided for in the DTPA.

SCS and Spoon present us with seven issues on appeal.

In their first issue, SCS and Spoon argue that the DTPA claims sounded in contract, not in the DTPA. They argue that the evidence is both legally and factually insufficient to elevate the claims to a DTPA action.

In an appeal from a bench trial, the trial court's findings of fact have the same force and effect as jury findings. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards that we use when we determine whether sufficient evidence exists to support an answer to a jury question. *Kennon v. McGraw*, 281 S.W.3d 648, 650 (Tex. App.—Eastland 2009, no pet.).

When we review evidence for legal sufficiency after a bench trial, we consider all of the evidence in the light most favorable to the trial court's judgment. We credit any favorable evidence if a reasonable factfinder could and disregard any contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22 (Tex. 2005). In a factual sufficiency review, we consider all the evidence and will uphold the trial court's finding unless

4

the evidence is too weak to support it or the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 118 (Tex. App.—Eastland 2008, pet. denied).

We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We independently evaluate conclusions of law to determine whether the trial court correctly drew the legal conclusions from the facts. *Walker v. Anderson*, 232 S.W.3d 899, 908 (Tex. App.—Dallas 2007, no pet.). We will uphold the trial court's conclusions of law if any legal theory supported by the evidence can sustain the judgment. *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 736 (Tex. App.—Dallas 2007, pet. denied). We will reverse the judgment of the trial court only if the conclusions are erroneous as a matter of law. *Id.*

The economic loss rule "govern[s] recovery of economic losses in selected areas of the law." *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011) (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 WASH. & LEE L. REV. 523, 534–35 (2009)). In *Sharyland*, the court reviewed the history of the rule in Texas. A part of that review included a discussion of *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991). DeLanney based his claim upon Southwestern Bell's negligent failure to publish a Yellow Pages advertisement. The court held, "When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." 809 S.W.2d at 494. The *Sharyland* court explained that, "because the plaintiff sought damages for breach of a duty *created under contract*, *as opposed to a duty imposed by law*, tort claims were unavailable." 354 S.W.3d at 417 (emphasis added).

The court also examined its previous case of *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986), a negligent construction case. In *Jim Walter Homes*, the court said, "The acts of a party may breach duties in tort or contract alone or simultaneously in both." 711 S.W.2d at 618.

Previously, the court has stated the general proposition that the mere breach of a contract does not constitute a false, misleading, or deceptive act under the DTPA. *Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983). This rule is based upon the general proposition that, when the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. *Sharyland*, 354 S.W.3d at 417. The supreme court

5

has said that we are to consider "both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996).

However, in *Sharyland*, the court pointed to a number of areas in which pure economic loss is commonly recoverable outside the contract arena. *Sharyland*, 354 S.W.3d at 417. One distinguishing factor seems to be that, when the source of the duty lies outside the contract, economic damages are recoverable. An example of such a factor is found in a cause of action for fraudulent inducement, to which example the *Sharyland* court referred when it cited *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998). There, the court declined to extend *DeLanney* to a fraudulent inducement claim even though the only damages were economic ones. The court noted that "Texas law has long imposed a duty to refrain from fraudulently inducing a party to enter into a contract, and . . . tort damages [are] not precluded simply because a fraudulent representation caused only an economic loss." *Sharyland*, 354 S.W.3d at 417. The duty arose outside the contract.

In its opinion in *Sharyland*, the court cited other examples of cases wherein the courts commonly allowed recovery of pure economic loss: negligent misrepresentation; legal or accounting malpractice; breach of fiduciary duty; fraud; fraudulent inducement; tortious interference with contract; nuisance; wrongful death claims related to loss of support from the decedent; business disparagement; and some statutory causes of action. *Sharyland*, 354 S.W.3d at 418–19.

In this case, the trial court found that Spoon told Searcy that she could trust SCS and him, that she was in good hands with them, and that they would complete the contract by December. Based upon these findings, the trial court concluded that SCS and Spoon used or employed false, misleading, or deceptive acts or practices under Section 17.50(a)(1) of the DTPA, as set forth in Section 17.46(b) of the DTPA. The trial court further found that SCS and Spoon used or employed false, misleading, or deceptive acts or practices under Section 17.50(a)(1) of the DTPA, as set forth in Section 17.46(b) of the DTPA, when they advertised to the public that they would perform quality work. These findings are supported by the evidence as we have discussed earlier in this opinion.

The trial court also found that SCS and Spoon had engaged in an unconscionable action or course of action under Section 17.50(a)(3) of the DTPA. SCS and Spoon made it clear in their reply brief that they are contesting the trial court's judgment on this ground.

An unconscionable action or course of action is defined in Section 17.45(5) of the DTPA as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." We determine whether the consumer was taken advantage of to a grossly unfair degree by looking at the entire transaction, not just at whether a defendant actually intended to take advantage of the consumer. *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex. 1985). Whether an action takes advantage of a consumer "to a grossly unfair degree thus requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Id.* at 584.

Searcy was not in the construction business; she ran Golden Brew Coffee. On the other hand, Spoon testified that he had twenty-five years experience in the construction business. Spoon had been involved in the construction business from age seventeen to age thirty-six acting as a laborer, supervisor, "and everything you could pretty much think of is what we did." Two of his construction businesses had failed. Furthermore, the record shows that Spoon knew that he had $60,000 in hot checks that he had written and that, when he wrote the checks, he had no money to cover them. He knew that he was facing felony criminal charges if he did not come up with $60,000 to cover the checks; the district attorney's staff had talked to him about the checks. Searcy had paid SCS and Spoon $61,470 within a month of the start of the project. She owed them a remainder of only $6,830 for the entire project, although, according to Spoon's own testimony, he and SCS had completed only four items under the contract.

The trial court found that Searcy received little or no value as a result of the work performed by SCS and Spoon, yet she had paid them $61,470 in the first month and had to borrow money to complete the project after she fired SCS and Spoon. Spoon knew that he "owed everybody" in town and in Andrews. Spoon also knew that previously he had been arrested in another county for theft after he did not complete another construction job. He also knew that he could operate only as he received revenue. Spoon knew that SCS was failing, and he was under a tremendous amount of strain. Spoon testified that the Searcy project escalated his problems.

7

When the court in *Sharyland* included "some statutory causes of action" among those in which pure economic losses were recoverable, it cited Section 17.50 of the DTPA as authorizing the recovery of economic damages, as defined in Section 17.45 of the DTPA, for certain deceptive trade practices. *Sharyland*, 354 S.W.3d at 419 n.24. Under the record in this case, we hold that the duty breached by SCS and Spoon: to refrain from engaging in or using deceptive trade practices as set out in Section 17.50(a)(3)—unconscionable actions or courses of action— was one that, as in *Formosa Plastics*, arose outside, and existed independently of, the contract. We also believe that the "nature of the remedy"—to use the language from *Crawford*—for a violation of those statutorily imposed duties is contained in Section 17.50(b)(1) of the DTPA: recovery of economic damages; attorney's fees; costs; and, among other things, potentially, additional damages. 917 S.W.2d at 17.

The trial court's findings that SCS and Spoon told Searcy that she was in good hands with them, that she could trust them, and that the project would be finished by December are supported by the record. And we hold that, under the well-settled standards of review set forth earlier in this opinion, the evidence is legally and factually sufficient to show that, knowing what Spoon knew and with Spoon's vast construction background, SCS and Spoon engaged in acts and practices which, to Searcy's detriment, took advantage of her lack of knowledge, ability, and experience to a grossly unfair degree to the extent that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated, as provided for in Section 17.50(a)(3) of the DTPA. As noted above, under the facts of this case, these are duties that arose outside the contract that SCS and Spoon had with Searcy; they arose statutorily under the DTPA and were not later subsumed in the contract. The trial court did not err if it granted Searcy's judgment on these grounds. Issue One is overruled.

Because we have found that the trial court did not err when it held that SCS and Spoon used or employed false, misleading, and deceptive acts or practices as enumerated in Section 17.46(b) of the DTPA and that they engaged in an unconscionable action or course of action under Section 17.50(a)(3) of the DTPA, we will not address other theories of recovery under Section 17.46(b)(5) and (7) of the DTPA, breach of warranty or fraud (including exemplary damages associated with that claim); they are not necessary to our final disposition of this appeal. TEX. R. APP. P. 47.1. We will proceed to discuss the damage award.

8

A consumer who prevails in a DTPA claim—and we have held that Searcy did—is entitled to recover economic damages under Section 17.50(b)(1). As used in that section, "economic damages" "means compensatory damages for pecuniary loss, including costs of repair and replacement." Section 17.45(11). The definition excludes certain items, but they are not relevant to our discussion. *See id.*

SCS and Spoon make various assaults on the damage award. In Issue Three, they argue that the trial court could not award damages to Searcy for her mental anguish. A close examination of the amended judgment in this case reveals that the trial court did not make any award for mental anguish. It made findings regarding mental anguish, but those findings did not result in the award of any damages for mental anguish. While we may not disregard findings merely because they are superfluous, SCS and Spoon cannot show that any error committed by the trial court when it made the findings either probably caused the rendition of an improper judgment or prevented SCS and Spoon from properly presenting this appeal. TEX. R. APP. P. 44.1; *Merry Homes, Inc. v. Chi Hung Luu*, 312 S.W.3d 938, 950–51 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Because the trial court did not award mental anguish damages, Issue Three is overruled.

Because we have upheld the judgment of the trial court under other provisions of the DTPA, we need not reach SCS and Spoon's claims in Issue Two regarding breach of implied warranties of fitness and good and workmanlike manner. For the same reason, as well as the reason that fraud relief was only alternatively awarded, we do not reach SCS and Spoon's claims in Issues Four and Five that the trial court erred when it granted relief for Searcy's fraud cause of action and the damages awarded in connection with that claim.

In Issue Six, SCS and Spoon "challenge the legal and factual sufficiency of the evidence to support the Trial Court's award of $49,470 as actual damages." They base their argument on the evidence and the findings of the trial court to the effect that four items of the contract were completed: purchase and install the concrete foundation; purchase and install a metal building; purchase and install six windows; and purchase and install three exterior doors. They maintain that to award Searcy $49,470 (the amount of the contract price paid to SCS and Spoon ($61,470) less the refund paid to Searcy ($12,000)) is to ignore the value of the four items that they completed and from which Searcy benefited.

The trial court also found, and each finding is supported by the evidence, that, even though SCS and Spoon completed some work, that work was completed unsatisfactorily for several reasons. Other items were partially completed, and SCS and Spoon performed no work on other items. The trial court found that Searcy received little or no value for the money she paid to SCS and Spoon. There is no other testimony of the value of the items as completed. We hold that the evidence is both legally and factually sufficient to support the judgment and that, in the absence of other objections, the trial court correctly computed Searcy's economic damages under Section 17.50(b)(1) of the DTPA. Other than the argument related to mental anguish damages and the position taken by SCS and Spoon that, if the economic damage award was incorrect, then additional damages would be improper, there has been no other challenge to the award of damages. Issue Six is overruled.

In Issue Seven, SCS and Spoon argue that the trial court erred when it did not segregate recoverable attorney's fees from unrecoverable ones. In their reply brief, SCS and Spoon acknowledge that they did not ask the trial court to segregate trial court attorney's fees. Because no request for segregation was made, Issue Seven is overruled. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997) (in the absence of an objection to the fact that attorney's fees are not segregated, the objection is waived).

The judgment of the trial court is affirmed.


JIM R. WRIGHT
CHIEF JUSTICE


October 18, 2012

Panel[2] consists of: Wright, C.J.,
McCall, J., and Hill.[3]

---

[2]Eric Kalenak, Justice, resigned effective September 3, 2012. The justice position is vacant pending appointment of a successor by the governor or until the next general election.

[3]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.