# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 18, 2024

Lyle W. Cayce
Clerk

_____

No. 23-10388

_____

Aircraft Holding Solutions, L.L.C.; CH300, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

Learjet, Incorporated, *doing business as* Bombardier
Aircraft Services (BAS); Bombardier, Incorporated,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-823

_____

Before Higginbotham, Stewart, and Higginson, *Circuit Judges*.
Per Curiam:[*]

Plaintiffs-Appellants Aircraft Holding Solutions, LLC ("AHS") and
CH300, LLC ("CH300") (collectively, "Appellants"), appeal the district
court's ruling and related judgments in favor of Defendants-Appellees
Learjet, Inc., d/b/a Bombardier Aircraft Services ("BAS") and Bombardier,
Inc. ("Bombardier"), following a six-day bench trial on various claims and

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

counterclaims that arose between the parties after an incident occurred involving damage to Appellants' aircraft as it was being stored in BAS's facility. Because we identify no reversible error in the district court's trial ruling and related judgments below, we AFFIRM.

## I. FACTUAL & PROCEDURAL BACKGROUND

CH300 is a limited liability company out of Florida, whose sole member is Ricardo Orrantia, a Mexican citizen. CH300 purchased a Bombardier Challenger 300 aircraft[1] ("Aircraft") for $9.3 million on May 22, 2015. Immediately after purchasing the Aircraft, CH300 conveyed the title to AHS, as trustee, as required by Federal Aviation Administration ("FAA") regulations which prohibit companies owned by foreign individuals from registering aircrafts with the FAA. *See* 14 C.F.R. §§ 47.1–47.19. Under the terms of Appellants' Operating Agreement dated May 18, 2015, AHS was the registered owner of the Aircraft while CH300 retained the "exclusive license to possess, use and operate [the Aircraft]" and was responsible for its maintenance.

In February 2017, Alberto Villanueva, Director of Maintenance for Mountain High Aviation, LLC ("Mountain High"), executed a proposal ("Proposal") on behalf of CH300 with BAS for routine maintenance and inspection services to be performed on the Aircraft.[2] The Proposal further stated that Mountain High's signature indicated "acknowledgment of the Bombardier Aircraft Services Proposal as well as the Proposal & Work Order Terms and Conditions." On March 28, 2017, Mountain High brought the

---

[1] Serial Number 20040 and Federal Aviation Administration Registration Number N234DP..

[2] It is undisputed that Mountain High acted as an agent on behalf of CH300 in executing the Proposal and related documents..

No. 23-10388

Aircraft to BAS's facility in Dallas, Texas, and signed Aircraft Work Order No. 198284 ("Work Order") which authorized BAS to perform 144-month inspection services and maintenance on the Aircraft. The Work Order also incorporated the Proposal by reference along with the BAS Service Center Work Order Terms and Conditions.

On March 29, 2017, while in BAS's facility, the Aircraft fell off of its maintenance jacks, sustaining significant damage (hereinafter referred to as "the Incident"). According to BAS, "the damage was a result of high wind gusts of over 30 mph causing the [A]ircraft to lift resulting in a failure of the jacks." The wind gusts had entered the hangar when a crew working on a different aircraft opened the hangar doors to move the other aircraft. BAS notified Appellants about the Incident the same day and offered to repair the Aircraft. AHS Manager Roman Ruiz responded to BAS that "[a]s Registered owner [of the Aircraft] we are letting you know you are not authorized to further work on the airplane until we have an independent evaluation of the damage sustained by the [A]ircraft by this incident. Our legal counsel will evaluate this situation and establish adequate communication channels as soon as possible."

On August 1, 2017, BAS entered into a Services Agreement with Bombardier to repair the Aircraft. Bombardier prepared a Damage Assessment and Repair Proposal for the work needed to repair the Aircraft and to return it to service. It subsequently conducted the repairs under Repair Order No. 198551 ("Repair Order"). According to Appellants, Bombardier caused further damage to the Aircraft while completing work under the Repair Order.

Meanwhile, on February 19, 2018, Appellants filed suit in Texas state court against BAS and Bombardier Aerospace Corp. ("BAC") advancing various state law claims arising from the Incident itself and the subsequent

repair attempts. In April 2018, BAS and BAC removed the case to federal court.

While the federal suit was pending, BAS notified Appellants on October 15, 2018, that the repairs to the Aircraft and the 144-month inspection were near completion, and that Appellants could retrieve the Aircraft from BAS's facility on October 31, 2018. BAS further stated that prior to returning the Aircraft to service, it needed to perform a final full body inspection of the Aircraft and conduct a flight test. BAS notified Appellants that if they failed to authorize the remaining work necessary to restore the Aircraft to service, BAS would return the Aircraft to the owner at the BAS facility in its current condition with all storage and hangar expenses and risk of loss to be "borne by the owner."

Appellants responded a few days later alleging that BAS's negligence rendered the Aircraft unairworthy, declining to approve any post-Incident repairs, and notifying BAS that Appellants had filed a complaint with the FAA. Appellants stated that the FAA's investigation of the complaint was expected to last at least 90 days and demanded that BAS "continue to store the Aircraft to prevent spoliation issues" during the FAA's investigation. Appellants further rejected BAS's demand that they take possession of the Aircraft or pay any costs and fees related to storage of the Aircraft.

BAS closed the Repair Order by October 31, 2018, after completing the 144-month inspection and all services included in the Proposal. BAS continued to store the Aircraft at its facility and performed periodic preventative maintenance and inspections on the Aircraft to prevent it from incurring further damage. On March 10, 2020, the FAA issued a memorandum with the results of its investigation concluding that:

> [t]he allegation that [the Aircraft] is "unairworthy" and "unsafe" in the context of work performed as a result of the

> damage from falling off the jacks is not substantiated. The [A]ircraft has yet to be returned to service after being repaired and is due numerous calendar driven inspections, [rendering] the [A]ircraft unairworthy until such a time that the required inspections are accomplished.

On March 17, 2021, Appellants sold the Aircraft to a third party, Central Connecticut Aircraft, LLC ("Central Connecticut"), for $3.4 million.[3] Central Connecticut quickly completed the required maintenance and returned the Aircraft to service. A few months later on September 16, 2021, Central Connecticut sold the Aircraft for $7.2 million before it ever left BAS's facility.

While the sale of the Aircraft was pending, Appellants moved on March 18, 2021, to file an amended complaint adding Bombardier to the suit. They subsequently obtained authorization to file a second amended complaint in June 2021, which became their operative pleading. In Appellants' second amended complaint, CH300 alleged claims against BAS for breach of contract and violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"). *See* TEX. BUS. & COM. CODE ANN. §§ 17.41–17.63. AHS alleged a claim against BAS and Bombardier for negligence and gross negligence as well as a claim against BAS for breach of implied bailment. In response, BAS asserted counterclaims against Appellants for breach of contract and quantum meruit. BAS also sought a declaratory judgment seeking to recover the storage fees and maintenance expenses it had incurred for the Aircraft from November 1, 2018 until Appellants' sale of the Aircraft to Central Connecticut on March 17, 2021.

---

[3] William Bergenty of Central Connecticut testified at trial regarding his purchase and resale of the Aircraft.

No. 23-10388

Bombardier and BAS also asserted, as affirmative defenses against Appellants' claims, the economic loss doctrine and contractual limitations.

On March 19, 2021, Appellants moved for partial summary judgment as to BAS's breach-of-contract counterclaim, AHS's negligence claim against BAS, and some of BAS's affirmative defenses. On August 13, 2021, Bombardier moved for summary judgment, and BAS moved for partial summary judgment. Bombardier and BAS both sought summary judgment on AHS's claims for negligence and gross negligence based on the economic loss rule and AHS's failure to raise a genuine fact issue on the merits of the claims. BAS also sought summary judgment on CH300's DTPA claim, AHS's implied bailment claim, and AHS's request for exemplary damages. BAS further sought to limit Appellants' damages to those allowed by the Proposal.[4]

In February 2022, after hearing oral argument, the district court ruled on the parties' competing motions for summary judgment in a comprehensive 51-page memorandum. *See Aircraft Holding Sols., LLC v. Learjet, Inc.*, 2022 WL 562760 (N.D. Tex. Feb. 23, 2022). Relevant here, the district court first analyzed AHS's negligence and gross negligence claims against BAS and Bombardier.[5] As an initial matter, it determined that AHS's negligence and gross negligence claims against BAS were not barred by the economic loss rule based on the Incident itself because AHS sought as damages the difference between the fair market value of the Aircraft when it was delivered to BAS and its fair market value when it was sold or at the time

_____

[4] In April 2021, before the district court rendered its summary judgment ruling, the parties stipulated to BAC's dismissal with prejudice from the suit.

[5] Although the district court addressed several other claims and issues between the parties in its summary judgment memorandum, only those relevant to the proceedings on appeal are included herein.

6

of trial.[6] The district court concluded that "[t]his proposed measure of damages, although economic in nature, [was] independent of, and unrelated to, CH300's contractual expectancy or 'benefit of the bargain' under the Proposal and Work Order," and thus, outside of the purview of the economic loss rule. *See SCS Builders, Inc. v. Searcy*, 390 S.W.3d 534, 540 (Tex. App. 2012, no pet.) (explaining that "when the source of the duty lies outside the contract, economic damages are recoverable"). It thus granted AHS's motion for partial summary judgment on BAS's contract-based affirmative defenses to AHS's negligence claim. Nonetheless, the district court denied AHS's motion for partial summary judgment on its negligence claims against BAS, holding that it had "not met the heavy beyond peradventure standard required to obtain partial summary judgment."

The district court did, however, determine that the economic loss rule barred AHS's claims for negligence and gross negligence with respect to BAS's and Bombardier's post-Incident repairs to the Aircraft because "[t]he duty that AHS contend[ed] Bombardier breached with respect to repairing the Aircraft [was] unquestionably the subject of a contract between BAS and Bombardier." On this basis, the district court granted Bombardier's motion for summary judgment on AHS's negligence and gross negligence claims and dismissed all claims against it with prejudice through a Rule 54(b) final judgment. It further held that "[b]ecause AHS [] failed to adduce evidence sufficient to raise a genuine issue of fact with respect to the subjective element of its gross negligence claim [against] BAS, [BAS was also] entitled

---

[6] "The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam) (citing *LAN/STV v. Martin K. Eby Const. Co., Inc.*, 435 S.W.3d 234, 235 n.2 (Tex. 2014) ("[P]arties may be barred from recovering in negligence or strict liability for purely economic losses.")).

to summary judgment dismissing this claim." In support of this holding the district court explained that the evidence presented by Appellants in support of their gross negligence claims against BAS "would not permit a reasonable jury to find that any particular BAS employee was subjectively aware of, but consciously disregarded, the jacking instructions provided in the Manual, or that, prior to the Incident, any BAS employee knew that the Aircraft had been improperly jacked." Consequently, the district court denied AHS's gross negligence claims against all defendants and determined that it would not be entitled to recover exemplary damages for any of its claims.

The remaining parties, Appellants and BAS, proceeded to a six-day bench trial.[7] Relevant here, AHS brought a claim against BAS for negligence; CH300 brought a breach-of-contract claim and a DTPA claim against BAS; and BAS brought a counterclaim against CH300 for breach of contract and quantum meruit.

On March 14, 2023, the district court rendered another detailed 45-page memorandum opinion. Therein, it provided that:

> BAS damaged the Aircraft through its negligence, but it arranged for Bombardier to repair the Aircraft at no cost to AHS or CH300 and to return it to airworthiness. CH300 is awarded its reasonable damages for loss of use of the Aircraft due to BAS's breach of contract. AHS receives no award for diminution in the Aircraft's value, but this is because AHS failed to prove that the Aircraft in fact diminished in value between March 28, 2017 and March 17, 2021. CH300 does not recover under the DTPA, but this is because it failed to prove this claim. BAS is awarded as an offset to CH300's loss-of-use damages the unpaid balance of what CH300 owes BAS under the parties' contract for [the] 144-month

---

[7] The bench trial took place between January 17 and January 24, 2023.

> inspection and maintenance services. And BAS is awarded on its quantum meruit counterclaim the sums it expended for costs to preserve the Aircraft from November 1, 2018 until its sale on March 17, 2021—expenses that CH300 would have paid someone in order to operate the Aircraft had CH300 retrieved the Aircraft, as it should have, on or about October 31, 2018.

It then rendered judgment in favor of BAS on its quantum meruit counterclaim in the amount of $416,713.73. It also rendered judgment in favor of CH300 on its breach-of-contract claim in the net amount of $45,765.00 ($113,000 in loss-of-use damages minus an offset of $67,235.00 to which BAS was entitled on its breach-of-contract counterclaim). It then dismissed all remaining claims and counterclaims.

After the district court issued its trial ruling, CH300 filed a motion for attorney's fees. The district court awarded CH300 attorney's fees in the amount of $77,101.50 for fees incurred through March 28, 2023, citing to BAS's decision not to contest the reasonableness of the requested fees. The district court declined to award CH300 two other sums of attorney's fees that it estimated it would incur on grounds that it failed to provide sufficient evidence supporting the additional requests for fees.

AHS and CH300 then filed a joint motion to amend the district court's trial ruling pursuant to Rule 52(b) or alternatively, to reconsider its ruling pursuant to Rule 59(e). *See* FED. R. CIV. P. 52(b); 59(e). In their motion, Appellants sought to amend, or request the district court to reconsider, its trial ruling due to a number of purported errors they alleged the district court committed in adjudicating their claims at trial. BAS also moved to amend the district court's pretrial order to include its quantum meruit claim, which appeared to have been omitted in error. The district court denied Appellants' motion and, in its discretion, granted BAS's

alternative motion to amend the pretrial order to include its quantum meruit claim.

Appellants filed an amended notice on August 21, 2023, appealing the district court's trial rulings, *i.e.*, its memorandum opinion and judgment, as well as the district court's memorandum opinion and order denying their motion to amend pursuant to Rule 52(b), or alternatively, to reconsider pursuant to Rule 59(e), and "all memorandum opinions and orders that otherwise merged into the *Judgment*."

## II. Discussion

Appellants raise three issues in their principal brief on appeal.[8] First, AHS argues that the district court erred in dismissing its gross negligence claim against BAS during the summary judgment proceedings. Second, Appellants contend that the district court erred in determining in its trial ruling that the Aircraft was ready for return to service in October 2018. Third, Appellants assert that the district court erred in admitting at trial the expert witness testimony of BAS's expert Kenneth Dufour regarding the pre-Incident value of the Aircraft. We address each argument in turn.

### A. AHS's Gross Negligence Claim Against BAS

After the trial proceedings, the district court held in its memorandum opinion that BAS's negligence caused the Incident because "its employees improperly jacked the Aircraft and then left the hangar doors open when moving a different aircraft so that a gust of wind was able to enter the hangar and lift the Aircraft off its jacks, causing extensive damage." BAS does not dispute on appeal, nor did it at trial, that it was negligent in causing the

---

[8] Although Appellants also raise other issues in their reply brief, as explained herein *infra*, we consider those issues waived and thus do not address them. *See Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015).

Incident. Prior to trial, however, the district court held in the summary judgment proceedings that AHS's claim of gross negligence fell short because it "failed to adduce evidence sufficient to raise a genuine issue of fact with respect to the subjective element of its gross negligence claim."

According to AHS, the district court erred in dismissing its gross negligence claim at the summary judgment proceedings because BAS "personnel knew of the risk of wind-gust; had a policy to avoid that risk; conspicuously posted the policy in the actual facility at issue to ensure all personnel were aware of the risk; but on the day on the Incident, no one bothered to pay attention to or adhere to that caution." AHS contends that these facts show BAS's "conscious indifference" to a subjectively known risk. In support of its argument, AHS points to various statements of BAS personnel "that jacking should always be done indoors with the doors closed" along with a "wind awareness placard on the doors at the Dallas Facility." AHS contends that the district court disregarded this "exceedingly compelling evidence" that BAS "and its personnel [were] specifically aware of the risk wind gusts posed to the suspended Aircraft" by attempting to distinguish between different wind-gust protocols when the Aircraft was actively being jacked, as opposed to when it was already jacked. We are not persuaded by these arguments.

We conduct a de novo review of the district court's summary judgment dismissing AHS's gross negligence claim. *See Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (citing FED. R. CIV. P. 56(a)). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A plaintiff's subjective beliefs, conclusory allegations, speculation, or

unsubstantiated assertions are insufficient to survive summary judgment. *See Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation omitted). "A panel may affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012) (internal quotation marks and citation omitted).

A showing of ordinary negligence under Texas law requires proof of "a legal duty, a breach of that duty, and damages proximately caused by the breach." *HIS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) (citation omitted). On the other hand, gross negligence requires a showing that the tortfeasor acted with greater culpability than simple negligence. *See* TEX. CIV. PRAC. & REM. CODE § 41.001(11). The standard for gross negligence has both objective and subjective components, *Marsillo v. Dunnick*, 683 S.W.3d 387, 392 (Tex. 2024), which the plaintiff must prove by clear and convincing evidence, *see U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *see also Anderson*, 477 U.S. at 254–55 (explaining that when a heightened proof standard will apply at trial, the same standard controls at summary judgment). To meet the standard, there must be an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Marsillo*, 683 S.W.3d at 392–93 (citing TEX. CIV. PRAC. & REM. CODE § 41.001(11)). "Under the first, objective element, an extreme risk is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." *Id.* at 393 (internal quotation marks and citation omitted). "Under the [second,] subjective element, actual awareness means the defendant knew about the peril, but its acts or omissions demonstrated that it did not care." *Id.* (internal quotation marks and citation omitted). "Circumstantial evidence is sufficient to prove either element." *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (citations omitted). A gross negligence finding can support an award of exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a)(3).

In rejecting AHS's gross negligence claim against BAS at the summary judgment proceedings, the district court reasoned as follows:

> Plaintiffs rely on an April 11, 2017 email exchange between BAS Quality Director Ralph Smith ("Smith") and Senior Air Safety Investigator Michael Lemay ("Lemay") to contend that "BAS knew that if the hangar doors at the facility were left open, there was a likelihood serious damage could be caused to aircrafts stored inside, including AHS's aircraft." **But the evidence that plaintiffs cite would not enable a reasonable jury to find that any particular BAS employee had a subjective awareness of the risks involved in opening the hangar doors and proceeded with conscious indifference.** In fact, both Smith and Lemay acknowledge in their emails that leaving the hangar doors open was likely the result of inadvertence on the part of BAS's employees.

No. 23-10388

(emphasis added). The record evidence supports the district court's analysis. Lemay's explanation of the "root cause" of the Incident is more helpful when placed in the full context of his emails with Smith:

> So it seems that the [Challenger] AMM procedure is clear, and in any case jacking in a closed door is basic knowledge among maintenance personnel. But I suspect that a contributing factor at play in this incident is that the [A]ircraft was already jacked when the doors were opened. If you are preparing to jack the aircraft, then your knowledge and the procedure would likely lead you to ensure that all conditions (i.e. doors closed) are right before going ahead. However, with an aircraft already jacked and sitting in the corner, it is less likely that a person opening the door would be prompted to think of the risk to the jacked aircraft due to opening the door. In other words, the jacking limitations are linked to the jacking procedure, and not to the door opening procedure, so there is no obvious cue for somebody opening the door that they need to be careful for jacked aircraft in the hangar. Moreover there is no "procedure" for opening the door, and you do not need to be a trained maintenance technician to open a door. So there is an obvious (in hindsight) human factor at work here . . . "out of sight, out of mind".

Smith echoed Lemay's observations, stating that "[t]here actually is a wind awareness placard on the doors at the Dallas Facility. But to you[r] point, 'Human Factors' at play. As when you are on focused mission to move aircraft, sometimes the team members 'can't see the Forrest for the trees[.]'"

AHS argues that Lemay's and Smith's conclusions that BAS "personnel did not adhere to the posted policy, because they were distracted or because of other 'Human factors,'" are "conclusive proof [that BAS] and its personnel knew of the risk of wind-gust" but acted with "conscious

indifference" to that "subjectively known risk." But this argument misses the mark. As the district court reasoned, "[t]he observations of both Smith and Lemay would only permit a reasonable jury to find that BAS's employees acted with ordinary negligence," but a finding of gross negligence demands more. *See* TEX. CIV. PRAC. & REM. CODE § 41.001(11). The subjective element of the gross negligence standard requires a showing that the "defendant *knew* about the peril, but its acts or omissions demonstrated that it did not care," *i.e.*, the defendant "proceed[ed] with *conscious* indifference to the rights, safety, or welfare of others." *Marsillo*, 683 S.W.3d at 392–93 (emphasis added). Thus, the standard requires more than human error, distraction, or as here, lack of a procedure altogether. As the record indicates, the Incident was caused when BAS personnel opened the hangar doors to move *another* aircraft, while AHS's Aircraft was already jacked and sitting in a corner. And as Lemay observed in his email to Smith, "the jacking limitations are linked to the jacking procedure, and not to the door opening procedure, so there is no obvious cue for somebody opening the door that they need to be careful for [another] jacked aircraft in the hangar"—such as the Aircraft. Indeed, as Lemay explained, "there is no 'procedure' for opening the door, and you do not need to be a trained maintenance technician to open a door." Given that there was no actual procedure that BAS personnel were required to follow when opening the hangar door, AHS cannot show that BAS personnel even knew of the potential risk to the jacked Aircraft, much less that they acted with "conscious indifference" to it, when they opened the hangar door to move the other aircraft. *Id.* This is a far cry from the clear and convincing evidence required to support a claim of gross negligence. *See U-Haul Int'l, Inc.*, 380 S.W.3d at 137 ("'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." (citations omitted)). For these reasons,

we hold that the district court did not err in dismissing AHS's gross negligence claim at the summary judgment proceedings. *Sanders*, 970 F.3d at 561.

### B. When the Aircraft was Fit for Return to Service

In its trial ruling, the district court held that BAS was entitled to recover a sum of $416,713.73 on its quantum meruit counterclaim as a result of the costs it incurred to preserve the Aircraft from November 1, 2018 until its sale in March 2021. This recovery amount was premised on the district court's determination that the Aircraft was fit to return to service on October 31, 2018. According to Appellants, the district court erred in determining that the Aircraft was fit to return to service on that date because Bombardier "had to strip off the wing covers to stamp identification numbers on internal parts" meaning that "Incident-derivative repair work was needed after October 2018." Thus, Appellants contend, the Aircraft was not yet returnable on October 31, 2018. Appellants argue that the district court's error in concluding that the Aircraft was fit to return to service in October 2018 tainted its other findings that (1) AHS failed to prove any diminution in value because the Aircraft would have resold for more than its appraised value if Appellants had authorized the calendar-driven maintenance that was due at that time; and (2) CH300 was obligated to pay BAS $416,713.73 in fees for preserving the Aircraft from October 2018 until the time it was sold in March 2021. We disagree.

We will upset the district court's findings of fact after a bench trial "only if we are left with the definite and firm conviction that a mistake has been committed." *Kenai Ironclad Corp. v. CP Marine Servs., LLC*, 84 F.4th 600, 605 (5th Cir. 2023) (internal quotation marks and citation omitted). "[T]he clearly erroneous standard of review following a bench trial requires even greater deference to the trial court's findings when they are based on

determinations of credibility." *Id.* (internal quotation marks and citation omitted). We thus "entertain a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently." *Id.* (internal quotation marks and citation omitted).

In its trial ruling, the district court explained that it "rejected key positions taken by [Appellants], such as that the Aircraft was not airworthy and ready to be returned to service on October 31, 2018." In support, it reasoned that "the necessary repairs to the Aircraft had been made by October 31, 2018 and that the Aircraft was ready to be returned to service at that time; all that was needed was [Appellants'] authorization and a test flight, to which [Appellants] refused to consent." The district court further noted that "over the course of nearly three years, [Appellants] refused to authorize any calendar-driven maintenance work to be performed on the Aircraft" which delayed the sale of the Aircraft and impacted its sale price.

The district court's conclusions that the Aircraft was ready to be returned to service by October 31, 2018, are supported by the record. Recall that BAS notified Appellants on October 15, 2018, that the repairs to the Aircraft and the 144-month inspection were near completion, and that Appellants could retrieve the Aircraft from BAS's facility on October 31, 2018, with only a full body inspection and a flight test needed prior to returning the Aircraft to service. On October 19, 2018, Appellants responded to BAS as follows:

> We are in receipt of your correspondence dated October 15, 2018 . . . Bombardier's negligence rendered the Aircraft unairworthy and the Aircraft is still unairworthy. The Owner has not approved of any of Bombardier's post-Incident repairs. In addition, the Owner has not "coordinated" any repairs or finishes. In fact, the Owner asserts that Bombardier's repairs are irregular and improper. Owner does not consent to Bombardier's flying

> the [A]ircraft and will not insure such use. Owner has hired a[n FAA] Airframe and Powerplant licensed consultant ("Consultant"). This Consultant has filed a complaint with the [FAA] because he is concerned about airworthiness, and obligated to report airworthiness concerns. The FAA is undertaking an investigation. The investigation may take ninety (90) days or more. During this time, the Owner demands that Bombardier continue to store the Aircraft to prevent spoliation issues. Pursuant to the Federal Rules of Evidence, Bombardier is required to preserve evidence, including the Aircraft. The Owner rejects your demand that Owner must take possession of the Aircraft. The Owner rejects your demand that Owner must incur costs and fees related to the storage of the Aircraft. The Owner also rejects your demand that Owner consent to and/or insure Bombardier's test flight of the unairworthy Aircraft.

Thus, Appellants' own words support the district court's reasoning that BAS was fully prepared to return the Aircraft to service but was prevented from doing so because Appellants refused to authorize the final flight test and the remaining basic necessary inspections. Nonetheless, in spite of Appellants' aggressive response declining its invitation to retrieve the repaired Aircraft and return it to service, BAS still closed the Repair Order by October 31, 2018. Moreover, it did so after completing the contracted-for 144-month inspection and all services included in the Proposal, and continued to store the Aircraft at its facility, performing periodic preventative maintenance and inspections to preserve it. To add insult to injury, the FAA disagreed with Appellants' claim that the Aircraft was not fit to return to service, determining in its March 10, 2020 memorandum that Appellants' "allegation that [the Aircraft] [was] 'unairworthy' and 'unsafe' in the context of work performed as a result of the damage from falling off the jacks [was] not substantiated." Indeed, as the FAA's memorandum further observed, as a result of Appellants' inaction, "[t]he [A]ircraft has yet to be

returned to service after being repaired and is due numerous calendar driven inspections, [rendering] the aircraft unairworthy until such a time that the required inspections are accomplished." The conclusions of the district court, BAS, and the FAA that the Aircraft was ready to be returned to service in October 2018 are further bolstered by the fact that after Appellants sold the Aircraft to a Central Connecticut in March 2021, the required maintenance and test flight that BAS had mentioned in its October 15, 2018 correspondence to Appellants were quickly completed and the Aircraft was returned to service. The Aircraft then sold for approximately $4 million in profit just six months later.

Appellants' argument regarding the wings of the aircraft being not properly repaired until March 2021 is equally belied by the record. As BAS explained through witness testimony at trial, no physical repair work was required to be performed on the Aircraft prior to its return to service in March 2021. Rather, a review of the paperwork prior to sale revealed that the paperwork erroneously reflected that certain materials had been used on the wings of the Aircraft in 2018 that were not actually used. After inspection of the wings and confirmation that the correct work was performed and the correct materials were used, the errors in the paperwork were corrected to reflect those facts. Although Appellants continue to assert that the wrong part numbers were stamped on the wings and had to be corrected later, even if true, this sort of issue presumably would have been addressed through one of the Aircraft inspections to which Appellants refused to consent. To be sure, Appellants' argument is that this exact issue was discovered through an inspection prior to completion of the Aircraft's sale in 2021. Appellants cannot now argue that the Aircraft was unfit to be returned to service due to

issues that could have been discovered and corrected through one of the very inspections they refused to permit BAS to conduct.[9]

Moreover, the district court reviewed extensive evidence at trial and heard hours of testimony related to the issue of whether the Aircraft was ready for return to service in 2018 and chose to credit the evidence and the testimony presented by BAS over that presented by Appellants. We afford "even greater deference" to the district court's factual findings "when they are based on determinations of credibility." *Kenai Ironclad Corp*, 84 F.4th at 605 (internal quotation marks and citations omitted). Further, given that the record evidence wholly supports the district court's conclusion that the Aircraft was ready to return to service in October 2018, we cannot say that we have been "left with the definite and firm conviction that a mistake has been committed." *Id.* Consequently, we hold that the district court did not clearly err in determining that the Aircraft was ready to return to service in October 2018. *Id.*

## C. Appraisal of the Aircraft

At trial, the district court concluded that AHS was not entitled to recover for diminution in the Aircraft's value because it failed to prove that the Aircraft in fact diminished in value between March 28, 2017 and March

---

[9] In their reply brief, Appellants also argue that the district court erred in neglecting to consider that BAS "fabricated replacement wing ribs for the left-hand wing without a fabrication quality control system, months before receiving design authority and instructions from Bombardier, Inc.'s engineering team [and a]s a result, [BAS] fabricated two wing ribs from the wrong material, stamped them with the wrong part numbers, and failed to fabricate and install matching wing ribs for the right-hand wing." They also contend that BAS "may" have performed time-mandated maintenance after October 31, 2018, before the Aircraft was sold in March 2021. Thus, Appellants aver, the Aircraft was not ready to return to service in October 2018 as the district court concluded. Because Appellants did not raise these arguments until their reply brief, we consider them waived. *See Dixon*, 794 F.3d at 508.

17, 2021. In reaching this conclusion, the district court determined that the pre-Incident value of the Aircraft was $6,725,720 based on the testimony of BAS's expert witness, Kenneth Dufour, a professional aircraft appraiser. The district court assigned less weight to the testimony offered by Appellants' expert witness Del Fogg and lay witness AHS Manager Ruiz.[10]

Appellants argue on appeal that the district court erred in admitting Dufour's appraisal opinion of the Aircraft given his admission that his appraisal was "null and void" beyond a certain time period. In support of this argument, Appellants point to language in Dufour's valuation stating that it is "null and void" after 30 days. Appellants further point to Dufour's testimony at trial that "[d]ue to dynamic trends, [he] strongly recommend[s] that a valuation update be conducted every 30 to 40 days." Appellants reiterate that "[i]t was error for the lower court to admit Mr. Dufour's appraisal," further pointing to his agreement at trial that, due to the rapidly changing nature of the market, the data in an appraisal report is "no longer really reliable" after 45 to 60 days. Appellants point out that "[t]he final report on which Mr. Dufour premised his trial testimony was dated November 20, 2021, whereas the trial did not begin until more than a year later, on January 17, 2023." Appellants summarize their argument by contending that "[b]ecause Mr. Dufour's opinion should not have been admitted—the lower court's findings regarding diminution in value of the Aircraft must be relegated to the damage range proffered by the Aircraft Appellants[,]" *i.e.*, approximately $8,232,518–$9,000,000.

––––––––––––––––––––––––

[10] Fogg opined that the pre-Incident value of the Aircraft was $8,232,518. Ruiz opined that the pre-Incident value the Aircraft was approximately $9 million, and possibly over $10 million. Although there was some discussion as to whether Ruiz could testify at trial regarding the pre-Incident value of the Aircraft because he was not a professional appraiser, the district court allowed him to testify as a lay witness under Rule 701. *See* Fed. R. Evid. 701.

No. 23-10388

In response, BAS argues that Appellants waived their argument regarding the admissibility of Dufour's expert report at trial. In support of its position, BAS points to the following statements by Appellants' counsel at trial withdrawing any objections to the admissibility of Dufour's opinions:

> That having been said—And I'm going to mention this about Mr. Dufour as well. I think somewhere we moved to exclude these people [*i.e.*, BAS's expert witnesses]. We no longer want to exclude them. We're going to ride with the court's giving them the proper weight in light of the examination. And, once again, it goes to these people's credibility . . . So fully confident of this court's knowledge of the standard, we just think that [another expert witness] and Mr. Dufour . . . should be judged on the weight rather than the exclusion. And we think their opinion should not be given much weight, but their testimony was helpful to the court. It was helpful to us. It was explanatory. It's just their opinions that don't carry the day under 700.

In their reply brief, Appellants state that even though they chose not to seek to exclude Dufour's testimony as an expert witness, they "never conceded his opinions were reliable or relevant." Their actual position, they aver, is that his "opinions should have been given little if any weight"—not that they are inadmissible. Though somewhat confusingly, Appellants then urge this court to reverse the district court's reliance on Dufour's appraisal of the Aircraft because it is "inadmissible." It makes no difference which argument Appellants decide they are making, however, because neither prevails.

Whether expert testimony should be admitted is controlled by the Federal Rules of Evidence. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citation omitted). Under Rule 702, "[e]xperts qualified by 'knowledge, skill, experience, training or education' may present opinion testimony to the jury." *Id.* (citing FED. R. EVID. 702). "A party seeking to introduce expert testimony must show (1) the testimony is based upon sufficient facts or data,

22

(2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (internal quotations marks and citation omitted). "The trial courts act as gate-keepers which make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (internal quotations marks and citation omitted); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* (citation omitted). Nevertheless, under Rule 702, an expert is not required to be highly qualified in order to testify about an issue. *Id.* "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* (citing *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")).

Ordinarily, we review the district court's decision to admit or exclude expert testimony for abuse of discretion. *Huss*, 571 F.3d at 452. However, where a defendant fails to object to the admission of expert testimony at trial, we review the district court's decision to admit the testimony for plain error. *See Foradori v. Harris*, 523 F.3d 477, 508 (5th Cir. 2008) ("Because Captain D's did not timely object to the testimony it now challenges, we review these claims for plain error only."); *United States v. Hill*, 63 F.4th 335, 355 (5th Cir. 2023) ("This court reviews preserved objections regarding the admission of expert or lay testimony for abuse of discretion, subject to harmless error analysis . . . Unpreserved errors of the same variety are reviewed for plain error." (internal quotation marks and citations omitted)); *see also United States v. Bilbo*, 19 F.3d 912, 916 (5th Cir. 1994) ("If there is no

contemporaneous objection to testimony whose admissibility is contested on appeal, the 'plain error' standard of review applies.").

"We apply the plain error standard of Federal Rule of Criminal Procedure 52(b) in civil cases." *Garcia-Ascanio v. Spring Indep. Sch. Dist.*, 74 F.4th 305, 309 (5th Cir. 2023) (internal quotation marks, alterations, and citation omitted). To show that the district court plainly erred in admitting Dufour's expert testimony regarding the Aircraft appraisal, Appellants must show that there was an error, that was "clear or obvious," that affected their "substantial rights." *Puckett v. United States*, 556 U.S. 129, 135 (2009). To show that the error affected their substantial rights, Appellants must be able to demonstrate that it "affected the outcome of the district court proceedings." *Id.* If these three showings are made, we may exercise our discretion to correct the error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.*

Here, we agree that Appellants failed to object to the admissibility of Dufour's testimony because the trial transcripts reveal that Appellants' counsel explicitly declined to seek to exclude Dufour as an expert witness. Consequently, we review for plain error Appellants' argument that the district court erred in relying on Dufour's appraisal of the Aircraft because it was "inadmissible." *See Foradori*, 523 F.3d at 508; *Hill*, 63 F.4th at 355; *Bilbo*, 19 F.3d at 916. Appellants have failed to make such a showing. Assuming arguendo that Appellants could show that the district court's admission of Dufour's expert testimony regarding the Aircraft appraisal was an error that was clear or obvious, they have not shown that any purported error affected their substantial rights given the overwhelming evidence presented at trial supporting Dufour's valuation of the Aircraft. *Id.* As an initial matter, Dufour testified at trial that he is an accredited senior member of the American Society of Appraisers with over thirty years' experience in the business of appraising aircrafts. He owns and operates Aviation Management

No. 23-10388

Consulting, Inc., which is a company that completes "numerous consulting projects for different aerospace companies and customers of aerospace companies" ranging "from consulting, assisting, buying and selling of airplanes, as well as appraising [other] assets." In addition, he is the chief executive officer and chief appraiser of VREF,[11] a commercial publication commonly used by other professional aircraft appraisers that provides "an online representation of values that range from general and corporate aviation" to "air transport" aircraft. In appraising the Aircraft in this case, Dufour followed the commonly accepted Uniform Standards of Professional Appraisal Practice guidelines. As the district court observed in relying on Dufour's appraisal value of the Aircraft at trial:

> [Dufour] testified that he calculated the pre-Incident value using a market comparison approach that utilized sales data obtained from several reliable sources, including VREF, which is an aircraft valuation tool commonly used by appraisers. He inspected the Aircraft, reviewed its permanent records, and analyzed sales data for 10-12 comparable Challenger 300s—*i.e.*, those with a production year between 2003 and 2006. He then opined, based on comparison sales from around the time of the Incident, that the value of the Aircraft on the day before the Incident was $6,725,720. The court finds Dufour's testimony to be both credible and reliable, and it is persuaded by his expert opinion regarding the pre-Incident value of the Aircraft.[12]

We agree with this reasoning. Moreover, Dufour's appraisal of the pre-Incident value of the Aircraft is supported by Central Connecticut's resale of

---

[11] VREF means "reference landing speed." *See* 14 C.F.R. § 1.2.

[12] It appears from Dufour's trial testimony that his valuation of the Aircraft was actually $6,72**7**,720, as opposed to $6,72**5**,720 as the district court noted in its trial ruling. However, because no party has argued error on this basis nor moved for the district court to amend its judgment on this basis, we do not address the issue herein.

the Aircraft for $7.2 million, just months after purchasing the Aircraft from Appellants.

Although Appellants insist that the district court's reliance on Dufour's expert opinion was erroneous because some of his reports contained standard disclaimers limiting the validity of his appraisals to a brief time period tied to their effective dates, their arguments are misplaced. As BAS emphasizes on appeal, the disclaimers were intended to prevent the valuations contained therein from applying to different time periods on subsequent dates, whereas Dufour's opinion regarding the pre-Incident value of the Aircraft remained the same from his original report through the trial and was not used to assess the Aircraft's value at a later date. As the district court explained, the disclaimer's "standard language, which is included to protect against liability in the non-litigation context, does not apply where, as here, Dufour opined on the Aircraft's pre-Incident value, which is a fixed value at a fixed period of time."[13] Accordingly, we hold that Appellants have failed to show that the district court plainly erred in admitting Dufour's expert testimony regarding the pre-Incident value of the Aircraft at trial. *See Puckett*, 556 U.S. at 135; *Foradori*, 523 F.3d at 508 (holding that because Appellant failed to show that his substantial rights were affected by the admission of the expert testimony, which was "overwhelmingly supported by other evidence," Appellant could not show plain error).

As stated herein *supra*, Appellants change course in their reply brief and attempt to persuade this court that their true argument regarding Dufour's expert testimony is that the district court erred by assigning it too

---

[13] For the same reason, we decline Appellants' invitation to address this "novel" issue in our circuit. Because there is no merit to their argument as they frame it, we do not get that far.

much weight, as opposed to admitting it. Because Appellants failed to raise this argument in their principal brief, we consider it waived. *See Dixon*, 794 F.3d at 508 ("Arguments raised for the first time in a reply brief are waived."). Assuming arguendo that Appellants had not waived this argument, we would still reject it on the merits given the overwhelming record evidence in support of the district court's decision to rely on Dufour's expert testimony regarding the pre-Incident value of the Aircraft. *See Foradori*, 523 F.3d at 508; *see also S.E.C. v. Snyder*, 292 F. App'x 391, 400 n.1 (5th Cir. 2008) (unpublished) ("Our review of expert testimony for sufficiency of the evidence is not as rigorous as it would be under a properly preserved challenge to the admissibility of the testimony under *Daubert*. In the present case, [the expert's] testimony was clearly supported by the evidence." (internal citation omitted)).

## III. Conclusion

For the foregoing reasons, we AFFIRM all rulings and judgments of the district court that Appellants challenge in this appeal.